955 So.2d 1241 (2007)
FUNNY CIDE VENTURES, LLC., and Sackatoga Stable, Appellants,
v.
The MIAMI HERALD PUBLISHING CO., and Knight-Ridder, Inc., Appellees.
No. 4D06-2347.
District Court of Appeal of Florida, Fourth District.
May 16, 2007.
Bruce S. Rogow and Cynthia E. Gunther of Bruce S. Rogow, P.A., Fort Lauderdale, for appellant.
Sanford L. Bohrer and Scott D. Ponce of Holland & Knight, LLP., Miami, for appellee.
PER CURIAM.
The elusiveness of horse racing's Triple Crown set the stage for this appeal, in which the plaintiffs argue the trial court erred in granting summary judgment for the defendants. The amended complaint alleged that the defendants' publication of an article that stated that the jockey had admitted having something in his hand during his ride of the horse Funny Cide in the Kentucky Derby ultimately led to significant *1242 financial losses for the plaintiffs. The trial court disagreed and granted summary judgment for the defendants. We affirm.
The plaintiffs' horse, Funny Cide, won the Kentucky Derby in 2003. Shortly thereafter, and before the running of the Preakness, the Miami Herald falsely reported that the jockey Jose Santos admitted carrying an object in his hand during the Kentucky Derby. The article implied that he had cheated in the race by using an illegal battery-operated device. The Herald published a "correction & clarification" after being served with a statutory demand for retraction. The Herald agreed that Santos had not admitted to holding the object and apologized for the error.
Jose Santos rode Funny Cide to victory in the Preakness, winning by several lengths. But, the Triple Crown eluded the jockey and the horse when they placed third in the Belmont.
The plaintiffs, Sackatoga Stable and Funny Cide Ventures, LLC, (FCV) filed an amended complaint against the Herald for injurious falsehood and claimed damages for lost marketing and horse racing revenue because of the article. Specifically, the amended complaint alleged:
Third persons were influenced by [the Herald]'s publications, and falsely made to believe that Sackatoga [and FCV] conducted its horse racing business unlawfully. Consequently, Sackatoga [and FCV] suffered in its business relationships, and the value of the Funny Cide brand was diminished by [the Herald]'s publications.
As discovery took place, the plaintiffs' claim took new shape. The plaintiffs claimed that the article caused the jockey to over-ride the horse in the Preakness in an attempt to vindicate himself and the horse, used up too much of the horse's strength, and resulted in a third-place finish in the Belmont. In answers to interrogatories, the plaintiffs claimed their damages took the form of the loss of the winner's purse in the Belmont and the bonus for the Triple Crown.
The defendant filed a motion for summary judgment on multiple grounds. One basis for the motion was that the claim was not legally supportable because the defendants did not cause the damages. The trial court granted the motion and entered summary judgment.
We review summary judgments de novo. L'Etoile Homeowners Ass'n. v. Fresolone, 940 So.2d 1170, 1170 (Fla. 4th DCA 2006).
The plaintiffs alleged the tort of injurious falsehood. In such actions, the pecuniary loss recoverable is "restricted to that which results directly and immediately from the falsehood's effect on the conduct of third persons and the expenses incurred to counteract the publication." Bothmann v. Harrington, 458 So.2d 1163, 1170 (Fla. 3d DCA 1984). This requires the damages to "have been foreseeable and normal consequences of the alleged wrongful conduct, and the conduct must be a substantial factor in bringing about the losses." Id.
Here, despite the novelty and creativity of the allegations, it cannot be said that the loss of the Belmont and the Triple Crown was a direct and immediate result of the Herald article. Simply put, it was not legally foreseeable that the article would cause the jockey to over-ride the horse in the Preakness, sapping the horse of its strength, and resulting in a third-place finish in the Belmont. Those damages are too tenuous and this claim cannot be countenanced in the law. We agree *1243 that the trial court correctly entered summary judgment for the defendants.
Affirmed.
STONE and MAY, JJ., concur.
Opinion by Judge FARMER.

I. Foreword
Once there was a maverick law Professor who denounced all legal writing. He said there were two things wrong with it: its content and its style.[1] This was more than 70 years ago.
Judicial writing is still a prominent form of legal writing. Most of it is dreary and tedious. As he said, opinions are filled with "long, vague and fuzzy words." Another critic has described them as "wordy, unclear, pompous, and dull."[2] Their style comes from the law reviews, the very one the maverick professor found ponderous and obscure.
A surprising number are way too long. There is often a painstaking account of background and trial which turns out to be unnecessary to grasp the essential issues to be decided. Many have extended discussions of rules and principles no one really challenges, or few would dispute. Judges pile on needless details of date, time and place, modified by confusing identifying terms (appellant-cross appellee-defendant) without regard to clarity. Extended comparative quotations alternate with exposition of one sort or another. Legal issues are analyzed through mind-numbing, many-factored "tests". Each factor is unloaded nit by nit, as though the judges actually decided the dispute in precisely that way. Arcane legal terminology is woven in and out, even though simpler, plainer words could be used. Simplicity, tone, style, voice, personality, levityall are shunned.
I admit that I too have made a generous contribution to this legal ennui all by myself. I can hardly deny my contributionsas this (with its footnotes) attests. My worst offenses came, I hope, when I was newer to this game. But now I wish to make a good act of contrition, do some penance, and offer an explanation for the opinion I prepared for the court in this case.
From the very moment of my appointment as a judge, I have chafed under this norm for appellate opinion writing. How did it become conventional? Who made it required? Why hasn't it been changed?
I struggled against it. There must be other styles, different tones, alternate voices. Not for every opinion. But for some.
One technique occurred to me. This idea would have an opinion in some of the forms, styles and characteristics associated with fiction. Good fiction is set in human experience. Good fiction illuminates. Fiction's style may yield questions, but the right questions can lead to discovery of truth.
A judge would use this style with restraint and propriety (of course). But in some cases such a style could be better suited to explain an outcome. A light fictional tone could express not ridicule but the heavy strain on logic or principle raised by some contentions in some contexts. In fact, this very case seemed appropriate to convey the essential idea. Although the argument is not frivolous, a *1244 lighter, story-like tone could better reveal the reasoning behind the result. This style would portray the inherent defect in the argument and in the process make legal reasoning vivid, law's result apt.
One prominent judge separates opinion writing into a "pure" form and an "impure" form. The former is the traditional version and the latter an occasional nonconformist form.[3] He explained:
"The pure style is an anodyne for thought. The impure style forceswell, invitesthe writer to dig below the verbal surface of the doctrines that he is interpreting and applying. What he may find is merely his own emotions. . . . But if the judge is lucky, he may find, when he digs beneath the verbal surface of legal doctrine, the deep springs of the law."[4]
It is not that one style is best. The judge chooses the one or the other because:
"If you are the kind of judge who thinks that the considerations that bear on a judicial decision range far beyond the canonical materials of formalist legal thoughtif you think that values (not just "feelings"), history, and policy are legitimate considerationsyou will find the `pure' style confining because it is not designed for the expression of those considerations. To the impure poet, `nothing that is available in human experience is to be legislated out of poetry.' Substitute `law' for `poetry' and we have the credo of the `impure' judicial stylist."[5]
In my view nothing that is available in human experience ought to be banned by convention in judicial opinion writing.
I should state publicly my own resolution, made several months ago. I had decided that the style of some opinions couldand shouldbe unconventionally changed for greater openness to all readers. I would try to write some opinions in styles and tones calculated to make legal reasoning clearer for those without law degrees. Then came this case.
When the panel conferred after oral argument, I did not detect any disagreement. While there washow shall I say this?an engaging air about a Derby-Preakness winner contending that a newspaper article caused the horse to lose the Belmont and the Triple Crown, even still there was yet within a serious aspect. The opinion had to show that the false bravado behind the certainty of the ten-dollar window[6] is not enough legally to make damages probable. So after thinking on the matter, I conceived of an unconventional approach. I would try a style, a tone, a voice to make apparent even to non-lawyers what I believed is the basic defect in their argument. The very style of the opinion itself would illuminate the legal analysis and outcome.
As it turns out, the other two members of the panel could not endorse the opinion or even some slightly altered version. They had concerns. Some other judges shared them. So I give this explanation for what I wrote, laying my version along side the panel's substitute. Readers can *1245 compare a conventional opinion with an unconventional stylethe pious with the impious.

II. Opinion
[Heading]

The Backstretch
The horse won the Kentucky Derby. Decisively. Tenth fastest time in Derby history. First jewel in the Crown.
Sure, there was some racket in the press afterwards. The Miami newspaper said it saw something in the jockey's hand, some illegal electric thing, maybe to spark the horse. Turns out the paper was seeing a fantasy in a shadow and retracted the story. But the noise had already begun. Are we looking at a Triple Crown horse?
Then the horse won the Preakness Stakes. And it's not even close. Wins by nearly ten lengths. The horse is so far out front, looks like he could make it past the wire and into the barn before they can take the photo. Hardly anyone asked if the horse ran out of gas for the Belmont. Are you kidding? Racing was all stirred up about the Crown. The feedbox noise grew hot.
Was it a dream, or did I hear stories about a guy who read in the paper the horse wins it all by a half? About another guy who said it was no bum steer, it was from a handicapper that's real sincere? Even about a third guy who knew this is the horse's time because his father's jockey's brother's a friend?[7]
Whatever. It's a lock. Two jewels for the Crown. Make room for the third.
Only, wait a minute. Did I hear another story about this one guy who wasn't so sure? Said it all depends if it rained last night?[8]
Anyway for the rest it's money in the bank. Everyone makes the horse the winner, so why worry about the race?
The horse did not win the Belmont Stakes. Yeah, he finished in the money, best he could do was show. Third place brings some money but not like a win.[9] And it definitely doesn't make the Crown. The guys in the stories were wrong.
Except maybe the one. It was a sloppy track. You sure it didn't rain last night?
Anyhow the horse sues the paper. Says the false report in the Miami paper damaged him. Paper says name your damages. Allow me to clarify, says he. Belmont purse is $1 million. Collaterals bring another $5 million. So I'm out $6 million.
But the steward in the court saw an illegal substance in the damages and disqualified them. The horse now wants the judges to let him back in.
The judges think it rained last night.

The Finish Line
This background is admittedly not your standard law talkcertainly not a conventional statement of background for a legal opinion. It might even be thought distorted humor rather than the good side of the opinion.[10] But it is meant to set the stage for a serious legal issue.
The trial judge decides what proof goes to the jury, and the jury decides the damages. *1246 No argument about that. But his damages have to be reasonably possible, no matter how certain the horse is about his loss. And the proof must allow the jury to find the loss probable, even if not certain. The judge's role is to figure out what evidence of the possible could also be probable.
According to someone, it's possible to trace every happening on earth back to something else. Like, for want of a nail the kingdom was lost. But that is not so with damages, which must be "proximate" to the wrong. The question is how close must they be? How proximate to get the loss to the jury? Between the merely possible and the possibly probable, when does evidence become too uncertain? Can the horse get there just by insisting that even damages depending on many variables are virtually certain? That's the general question.
And then there's the particular tort in this case. In an action for injurious falsehood, disparagement damages are "restricted to that which results directly and immediately from the falsehood's effect on the conduct of third persons. . . ." Bothmann v. Harrington, 458 So.2d 1163, 1170 (Fla. 3d DCA 1984); see also RESTATEMENT (SECOND) OF TORTS, § 633 (1967). Defendant's wrongful act "must be the legal cause of the claimed pecuniary losses." 458 So.2d at 1170. The damages must be the "foreseeable and normal consequences [e.s.] of the alleged wrongful conduct, and the conduct must be a substantial factor in bringing about the losses." Id.; see also Jacksonville v. Raulerson, 415 So.2d 1303, 1305 (Fla. 1st DCA 1982) (legal cause exists only where injuries are the reasonably foreseeable result of the wrongful act).
An essential element of injurious falsehood is that it caused the victim special damages. See Donald M. Paterson Inc. v. Bonda, 425 So.2d 206, 208 (Fla. 4th DCA 1983) (failure to produce evidence of any damage); and Continental Dev. Corp. of Fla. v. Duval Title & Abstract Co., 356 So.2d 925, 927 (Fla. 2d DCA 1978) (actionable injurious falsehood must cause actual or special damage). The victim's proof must eliminate the possibility that a loss of a future expectation can be explained by other factors. See generally RESTATEMENT (SECOND) OF TORTS, § 633(1)(a), Reporters Note (1967). Consequently, whatever may be the line for proximate damages in tort actions legally, for this cause of action the horse must plead and prove special damages thatafter eliminating all other causes for his claimed loss of an expectationare directly and immediately caused by the falsehood.
The horse's theory of damages goes like this. The false Miami Herald article about the Kentucky Derby win insulted the integrity of the jockey. Feeling wronged, jockey overcompensates in the Preakness. Right out of the gate he uses the whip on the horse all the way to the wire in spite of a big lead. So at Belmontand we got this from the horse's mouthpiecethe horse had already spent all his reserves and had nothing left to win the Triple Crown. As a result of the disparagement, he lost the money a Belmont win would have brought.
Readers will grasp the crucial implication buried deep inside this damages scenario. If the disparagement is what caused the horse to lose the Belmont, then the horse must have been sure to win the race without it. Does the evidence bear out this implication?
No, because the horse's theory doesn't eliminate other factors. Nothing shows that the article was likely a substantial factor at Belmont. To the contrary, the Herald countered with evidence of written *1247 statements from the horse's own jockey and managing partner not long after the race. They wrote then that the loss came from a muddy track at Belmont, and the horse spent too much energy before entering the gate. So what makes a win at Belmont inevitable? Are they saying all winners of both the Derby and Preakness go on to win the Belmont?[11]
With his accustomed candor, the horse's able appellate counsel conceded there are far more Triple Crown losers than winners. In fact history shows it's two-to-one against. If it were otherwise, the possibility of a Triple Crown would not ignite such excitement. And needless to say, the Damon Runyon stories and the Frank Loesser lyrics would lose their most vital element. Runyon, who understood such things, was known to say that "all life is six-to-five against," making a loss probable in most anything but also making winning just close enough to be tantalizing.[12]All lifewe are led to believeincludes horse racing. And as Sky Masterson repeated from the "Good Book": "the race is not to the swift . . . but time and chance happen to them all."[13]
The writings of both the owner and the jockey show they believed that a sloppy track was the substantial factor in the loss at Belmont, rather than the jockey's ride in the Preakness. The horse may even have exhausted too much energy at Belmont before the start of the race. He did delay in getting out of the gate. The prospect of a win is touched by so many variables it's just naturally in doubt. Without some sign of evidence disposing of other causes for his loss at Belmont, the horse is stuck with the variables.
These other, more direct, immediate and normal causes persisting, we need not labor in this case to cast for all time where damages become too speculative for trial. Here it is enough for us to say the theory behind the loss of a Belmont win may be this side of possible but it is a long way from being directly and immediately caused by the Herald's articles, or from being the foreseeable and normal consequences of disparagement.
Damages must fit snugly in the context. The context is there is no certainty in horse racing. The horse has to win the race. In competition you have to play and win. No one is certain to win today simply because he won before. A win yesterday doesn't promise another today or tomorrow. If it did, there would be many more Triple Crowns; more pennants for the Boston Red Sox; San Diego would be last year's Super Bowl champ; Florida State would be the ACC football champ; and the former Soviet Union would have the gold medal in hockey from the 1980 Olympics.
*1248 The decision has to be Affirmed.[14]
Shame it rained last night.
NOTES
[1] Fred Rodell, Goodbye to Law Reviews, 23 VA. L.REV. 38, 38 (1936). He is also rumored to have disdained the title of Professor, ruefully explaining that he never played piano in vaudeville or a bawdy house.
[2] David Mellinkoff, THE LANGUAGE OF THE LAW 24 (1963).
[3] Richard A. Posner, Judges' Writing Styles (And Do They Matter?), 62 U. CHI. L.REV. 1421 (1995) (referring to Pure and Impure Poetry, in Robert Penn Warren, SELECTED ESSAYS at 26 (Random House 1958).

Pure and impure are his replacements for the slightly invidious terms high and low. If I were writing Judge Posner's piece, I might have used my religious metaphor (contrition and penance) to suggest the terms pious (describing the authorized style) and impious (describing the "reformed" style).
[4] 62 U. CHI. L.REV. at 1447.
[5] 62 U. CHI. L.REV. at 1448.
[6] Is there still a two-dollar window?
[7] Does all this sound like it came from a newspaper guy who wrote a book and a songwriter who put it to words and music? Yeah, I know. Book's by Damon Runyon. Songwriter's name is Frank Loesser; music is Fugue for Tinhorns; play is Guys and Dolls. You could look it all up.
[8] See n. 8.
[9] He's a geldingno breeding rights. A win would have made a nice nest egg.
[10] Maybe the owners of the horse will understand this.
[11] The history is striking. Since 1919, only eleven horses have won all three races: Sir Barton (1919), Gallant Fox (1930), Omaha (1935), War Admiral (1937), Whirlaway (1941), Count Fleet (1943), Assault (1946), Citation (1948), Secretariat (1973), Seattle Slew (1977), and Affirmed (1978). Twenty horses have won the Kentucky Derby and the Preakness Stakes but failed in the Belmont Stakes: Burgoo King (1932), Bold Venture (1936), Pensive (1944), Tim Tam (1958), Carry Back (1961), Northern Dancer (1964), Kauai King (1966), Forward Pass (1968), Majestic Prince (1969), Canonero II (1971), Spectacular Bid (1979), Pleasant Colony (1981), Alysheba (1987), Sunday Silence (1989), Silver Charm (1997), Real Quiet (1998), Charismatic (1999), War Emblem (2002), Funny Cide (2003), and Smarty Jones (2004). See www.thetriplecrown challenge.com.
[12] Introduction by William Kennedy, GUYS AND DOLLS: THE STORIES OF DAMON RUNYON, xiv (Penguin Group 1992).
[13] ECCLESIASTES 9:11.
[14] No reference of course to the last Triple Crown winner, Affirmed (1978).